IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NATIVE PIXEL INC., | § | Case No. 2:26-cv-697 |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| WIX.COM LTD., | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 et seq., in which Plaintiff Native Pixel Inc. ("Plaintiff" or "Native Pixel") makes the following allegations against Defendant Wix.com Ltd. ("Defendant" or "Wix"):

**PARTIES**

1. Plaintiff Native Pixel Inc. ("Native Pixel" or "Plaintiff") is a Florida corporation with its principal place of business at 8018 Laurel Ridge Court, Delray Beach, FL 33446.

2. On information and belief, Defendant Wix.com Ltd. ("Wix" or "Defendant") is a company organized and existing under the laws of the State of Israel, with its principal place of business at 40 Namal Tel Aviv Street, Tel Aviv, Israel. Wix's ordinary shares are traded on the Nasdaq Stock Market under the symbol "WIX." Wix may be served with process in accordance with Federal Rule of Civil Procedure 4(f) and 4(h)(2), including pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

3. On information and belief, Wix owns and operates the Base44 business and platform, which Wix acquired in June 2025 for initial consideration of approximately $80 million plus additional earn-out payments paid through 2029. (See https://www.wix.com/press-

room/home/post/wix-further-expands-into-vibe-coding-with-acquisition-of-base44-a-hyper-growth-startup-that-simplif (last visited August 13, 2026)). On information and belief, Wix, directly and through subsidiaries and intermediaries, develops, designs, makes, uses, tests, hosts, operates, distributes, markets, offers to sell, and/or sells products and services in the United States, including in the Eastern District of Texas. The products presently accused and mapped in this Complaint include the Base44 AI App Builder and its associated generation, editing, project-maintenance, hosting, and developer functionality, together with Base44's mobile app-store packaging capability and resulting iOS and Android WebView-wrapper applications (collectively, the "Accused Products"). Wix also offers related AI web-creation products, including Wix Harmony, Wix Vibe, and the Wix AI website builder (the "Related Wix Products"). Public materials concerning the Related Wix Products are cited as corroborative evidence of Wix's engineering vocabulary and related technical capabilities; Plaintiff does not assume that a technically distinct Related Wix Product practices any asserted claim through the same mechanism as Base44, and any additional instrumentality will be supported by a claim-specific mapping.

## INTRODUCTION

4. This complaint arises from Defendant's unlawful infringement of the following United States patents owned by Plaintiff, which relate to graphical user interface programming systems and cross-platform streamable user interfaces: United States Patent Nos. 10,331,423 (the "'423 Patent"), 11,816,459 (the "'459 Patent"), and 12,118,335 (the "'335 Patent") (collectively, the "Asserted Patents" or the "Patents-in-Suit").

5. The Asserted Patents claim specific technical mechanisms for graphical user interface ("GUI") development and delivery. Asserted claim 19 of the '335 Patent recites, among other things, a processor and non-transitory storage containing a front-end development software tool

with a first UI element associated with a first function; a distinct translation layer associating that function with device-native computer code associated with a first device; and a template mechanism that converts data of the first function into code native to that first device by selecting one or more templates for each portion in a tree data structure, modifying selected templates to create output native source code, separately selecting feature-based templates for predetermined features, and updating those feature-based templates with the native source code and the UI element. Asserted claim 17 of the '459 Patent recites a related but materially different architecture: a front-end development software tool and translation layer; a template that converts data from the first function into computer-generated human-readable created code through the per-portion tree/template operations, including updating feature-based templates with native source code and one or more GUI design elements native to a second device; and a further limitation requiring processing of information regarding a desired GUI, similarity-based selection of a native-code template, and assembly of code based upon a source-tree structure. Asserted claim 12 of the '423 Patent recites a distinct computer-program-product architecture involving graphical design of a UI archetype in an IDE project, generation of an environment-independent view-controller object, compilation and marketplace deployment of an executable that lacks sufficient application-specific drawing instructions and carries the claimed identifier references, storage and runtime retrieval/rendering of the UI object, and runtime supersession of an embedded UI instruction with a different interface from that object. Plaintiff's theories depend on these express combinations and relationships, not on generic AI generation, generic templates, generic trees, or remote updating in the abstract.

6. The patent family was developed years before the present wave of AI application-building products. Plaintiff does not contend, however, that generic templates, reusable

components, hierarchical UI representations, webview wrappers, or software code-generation techniques were unknown. Plaintiff's allegations are narrower: Wix's Base44 systems practice the particular combinations and relationships recited by the asserted claims, including the claimed translation-layer, per-portion template, native-source, feature-template, source-tree, and marketplace-delivery requirements. The Related Wix Products are not treated as interchangeable with Base44 merely because they use AI or generate interfaces.

7. The patent family arose from work at ZigiSoft, LLC led by named inventor Frank Parsolano, III and assisted by patent counsel and his co-founder, Arnie Foxx. The work addressed concrete software-development problems then encountered when designers created visual interfaces that developers had to recreate as platform-specific code and when deployed applications required rebuilding and marketplace resubmission for interface changes. The patent disclosures do not claim the generalized goal of reducing those inefficiencies; the asserted claims recite specific machine architectures for doing so, as described below.

8. U.S. Application Serial No. 15/352,834 was filed on November 16, 2016 and disclosed, among other things, front-end GUI programming, target-platform code generation, hierarchical UI-tree processing, recursive per-portion template selection, modification of selected templates into native source code, and feature-specific template processing. The later '459 application identifies itself as a continuation-in-part of that application and states that it claims benefit of U.S. Provisional Application No. 62/457,811, filed February 10, 2017. These family relationships are stated as bibliographic history; nothing in this Complaint concedes that every asserted claim is entitled to the same claim-specific effective filing date.

9. The patent disclosures describe, among other things, recursive template processing for target-code generation; programmable UI elements associated with logic; platform-targeted

source-code generation; and, in the '423 family, server-side storage and runtime delivery of UI content to marketplace-deployed applications. The asserted claims select particular combinations from those disclosures and must be evaluated according to their own limitations.

10. The asserted claims are not directed merely to replacing human labor with automation. The '459 and '335 claims require a particular software architecture that ties a function-bearing UI element to device-targeted code through a translation layer and then performs the separately recited template operations; the '423 claim requires a particular separation between a marketplace-deployed executable and the UI object it later receives and renders. Plaintiff alleges that these architectures provide concrete technical benefits in software generation, portability, maintainability, and deployment.

11. PixelFree Studio, Inc., a Nevada corporation ("PixelFree Studio" or "PixelFree"), is a software development company headquartered in Delray Beach, Florida, with development operations in Saarbrücken, Germany. PixelFree Studio developed a patented design-to-code platform that enables designers and developers to transform graphical user interface designs into production-ready, human-readable native code across multiple programming languages and platforms with a single operation. PixelFree Studio's technology reduces front-end development time by up to 80%, converting projects that once took months into tasks completed in minutes.

12. PixelFree Studio's patented software generates human-readable PRO-Code in six programming languages — HTML5, Vue.js, React, Angular, C# (desktop), and C# (web app). Unlike competing tools that rely on proprietary libraries or pre-built runtime frameworks, PixelFree Studio generates code native to the target platform, affording users complete ownership, hosting flexibility, and customization. The platform supports Figma project importation, vector

graphics handling, responsive design, and cross-platform consistency across Windows, macOS, iOS, Android, Linux, and web environments.

13. PixelFree Studio was co-founded by Philipp Geppert (CEO), Solomon Hartman (President), Arnie Foxx (Founder), and Felix Förster (CFO). The company's genesis traces to foundational work in graphical user interface programming systems, with its earliest patent applications filed as early as 2016. The late Solomon Hartman (d. May 2025) was instrumental in shaping the company's intellectual property strategy and commercialization efforts. PixelFree Studio's technical team includes specialists in deep learning, artificial intelligence, and software engineering, including personnel holding doctorates in computer engineering. Native UI, Inc., a Florida corporation ("Native UI"), spun off from PixelFree Studio on or about November 28, 2022, to separately pursue development and commercialization of the technology.

14. The asserted portfolio includes U.S. Patent No. 10,331,423, which issued from a continuation of U.S. Application No. 15/352,834; U.S. Patent No. 11,816,459, which identifies itself as a continuation-in-part of that application and as claiming benefit of Provisional Application No. 62/457,811; and U.S. Patent No. 12,118,335, which issued from a continuation of the '459 application. These family relationships do not constitute a pleading concession that every limitation of every asserted claim is entitled to any single family-wide effective filing date. Any entitlement to an earlier filing date is claim-specific and depends on the applicable statutory requirements.

15. PixelFree Studio’s technology has received independent market and technical validation. The company has twice been awarded the European Union Seal of Excellence, a quality label awarded by the European Commission to proposals submitted under Horizon Europe calls that meet rigorous quality thresholds. PixelFree began demonstrating its software on YouTube in

2022. The company also presented its software at the WeAreDevelopers World Congress in Berlin in June 2022; Web Summit in Lisbon in 2022 and 2023; CES in Las Vegas in January 2023 and 2024; GITEX Global in Dubai in 2022 and 2024; and ICT Spring in Luxembourg in 2022, among other industry events. The company secured separate loans of one million euros (€1,000,000) and five hundred thousand euros (€500,000) from Effre, a European governmental lending source, to accelerate the development and commercialization of its platform. This recognition and investment provide evidence that the claimed technical approach was regarded within the industry as a technical advance rather than a routine or conventional practice.

16. PixelFree Studio maintains dual operations in the United States and Europe. Its European development center in Saarbrücken, Germany, is situated near the Max Planck Institute for Software Systems, the German Research Center for Artificial Intelligence (DFKI), the Korea Institute of Science and Technology (Europe), and more than a dozen research universities specializing in computer science.

17. Native Pixel, Inc. ("Native Pixel") is the intellectual property holding and enforcement arm of the PixelFree Studio and Native UI family of companies. Native Pixel was established to hold, manage, protect, and enforce the patent portfolio developed by and originally assigned to PixelFree Studio, Native UI, and their affiliated entities.

18. Native Pixel, Inc. is an affiliate of PixelFree Studio, Inc. and Native UI, Inc. The Patents-in-Suit were developed through the research and development efforts of PixelFree Studio's and Native UI's engineering and design teams, building on work dating back to 2016. The patent portfolio was subsequently assigned to Native Pixel, Inc. to consolidate intellectual property management and enforcement within a dedicated corporate entity.

19. Native Pixel, Inc. is the current owner by assignment of all right, title, and interest in and to the patents asserted in this action, including U.S. Patent Nos. 10,331,423, 11,816,459, and 12,118,335. As the assignee and current owner of these patents, Native Pixel, Inc. possesses all rights necessary to bring and maintain this action for patent infringement, including the right to collect damages for past, present, and future infringement as well as injunctive relief. Each assignment in the chain of title from the inventors through ZigiSoft, LLC, Native UI, Inc., and PixelFree Studio, Inc. to Native Pixel, Inc. was executed and effective before the filing of this Complaint and conveyed all substantial rights in the Asserted Patents, including the right to sue for and recover past damages. The Patents-in-Suit are properly assigned to Native Pixel, Inc., and Plaintiff has standing to bring this lawsuit.

20. The design-to-code and AI application-generation solutions market is one of the most rapidly growing segments of the global software development industry and constitutes a multi-billion dollar addressable market.

21. Wix.com Ltd. is one of the world's largest web development platform companies. Wix reports that it has reached over 300 million users worldwide. (See https://www.wix.com/about/us (last visited August 13, 2026)). Wix makes, uses, tests, hosts, sells, offers to sell, and deploys products and services that practice the inventions claimed in the Patents-in-Suit, including through its Base44 business.

22. In June 2025, Wix acquired Base44, an AI-powered "vibe coding" platform, for initial consideration of approximately $80 million plus earn-out payments through 2029. Wix's own acquisition announcement describes Base44 as "an AI-powered platform that enables anyone to create fully-functional, custom software solutions and applications using natural language, without the need for traditional coding," and states that the platform "manages technical details behind the

scenes, from databases and authentication to deployment – removing the need for third-party integrations." (See https://www.wix.com/press-room/home/post/wix-further-expands-into-vibe-coding-with-acquisition-of-base44-a-hyper-growth-startup-that-simplif (last visited August 13, 2026)). Contemporaneous press coverage reported that Base44 had grown to approximately 250,000 users within roughly six months of launch. (See https://techcrunch.com/2025/06/18/6-month-old-solo-owned-vibe-coder-base44-sells-to-wix-for-80m-cash/ (last visited August 13, 2026)).

23. Base44's platform converts a user's GUI design input — natural-language descriptions, imported Figma design frames, uploaded screenshots, and on-screen element selections — into complete, working applications. Base44's own materials state: "Describe what you want, and Base44 generates the structure, design and logic for you." (See https://base44.com (last visited August 13, 2026)). Base44's documentation instructs users: "Describe your app in plain language and let Base44 build it," and "Watch your app appear in the preview window as Base44 works. You can explore your app right away and try out any features by clicking the preview." (See https://docs.base44.com/Getting-Started/Quick-start-guide (last visited August 13, 2026)).

24. Base44 generates genuine, human-readable application source code that customers may inspect, edit, export, and maintain. Base44's developer documentation states: "Base44 apps are standard React apps built with Vite," organized in a source tree in which "pages" hold file-based routes ("Home.jsx becomes /, Settings.jsx becomes /settings") and a "functions/" directory holds backend logic in which "[e]ach TypeScript file in this directory is a separate function." (See https://docs.base44.com/developers/app-code/overview/project-structure (last visited August 13, 2026)). The generated code is exposed for human inspection and editing in Base44's Code tab: "The Code tab lets you view and edit your app's source code directly, giving you control over your

app's functionality, design, and behavior while seeing changes immediately," and Base44 advises that "basic familiarity with React and JSX helps." (See https://docs.base44.com/developers/app-code/editor/code-tab (last visited August 13, 2026)). Users may "[p]ush your Base44 app code to a GitHub repository for version control, collaboration and external deployment." (See https://base44.com/blog/base44-github-integration (last visited August 13, 2026)).

25. Base44 generates and revises applications using reusable code structures. Base44's generated project contains a components directory holding reusable UI elements and a subfolder containing pre-built UI components, and Base44's Edit mode permits a user to select an individual element in the live preview and modify that element directly. Moreover, Base44 offers a template marketplace — "The template marketplace is your shortcut to building great apps on Base44" — and instructs users to "[e]xplore Base44's templates to get ideas or start with a base for your app." (See https://docs.base44.com/Getting-Started/App-templates; https://docs.base44.com/Getting-Started/Quick-start-guide (each last visited August 13, 2026)). Every generated application receives pre-built, feature-keyed components: "All new Base44 apps come with custom login pages built in. You get ready-made login, register, forgot password, and reset password pages that you can customize to match your app's design." (See https://docs.base44.com/Setting-up-your-app/Managing-login-and-registration (last visited August 13, 2026)). Base44 states that these custom login pages "were released to all users on 2 June, 2026," and that applications on Base44's prior built-in login received a login screen whose "design is managed by Base44 and cannot be changed." (Same source; last visited August 13, 2026). Payment features are added as pre-built capabilities: "Base44 lets you set up Stripe payments directly from the AI chat in your app editor." (See https://docs.base44.com/documentation/setting-up-your-app/setting-up-payments (last visited August 13, 2026)).

26. Base44's editor surfaces convert literal graphic design artifacts into working code. Base44's Figma import instructs: "Turn your Figma designs into working apps and pages," because "Base44 connects to Figma so you can build directly from your designs"; Base44's changelog states that a user may "[p]aste a frame link and Base44 recreates the layout, structure, and visual style," and that users "can now import Figma frames as new pages at any point while building." (See https://docs.base44.com/Getting-Started/import-from-figma; https://docs.base44.com/changelog/product (each last visited August 13, 2026)). In Base44's visual Edit mode, the user clicks any element in the running preview and styles it directly: Edit mode "[l]ets you click elements in your preview to adjust visuals directly," and "you can style any individual element directly. Select an element and use the icons in the Edit toolbar to change its colors, typography, spacing, corner radius, opacity, or add custom Tailwind classes." (See https://docs.base44.com/Building-your-app/AI-chat-modes; https://docs.base44.com/Building-your-app/Design (each last visited August 13, 2026)).

27. Base44 hosts and serves every generated application from its own cloud infrastructure: "Every Base44 app is live on a free built-in URL (myapp.base44.app) from the moment you create it," and "Base44 issues and renews your SSL certificate automatically once your domain is connected, so your app is always served securely over HTTPS." (See https://docs.base44.com/Setting-up-your-app/Setting-up-your-custom-domain (last visited August 13, 2026)). During editing, Base44 operates a managed cloud sandbox and development server for each application: "get_app_preview_url brings up the dev server and returns the preview URL. Vite HMR reflects your edits as you make them," and "[e]very mutating call schedules a debounced auto-commit (~5 seconds): the change is committed and pushed to Base44's code

storage." (See https://docs.base44.com/developers/skills/base44-remote-dev/index (last visited August 13, 2026)).

28. In 2026, Base44 launched mobile app-store packaging: "You can now prepare and package your Base44 app for the Apple App Store and Google Play directly from the editor." (See https://docs.base44.com/changelog/product (last visited August 13, 2026)). Base44's mobile documentation states: "Base44 gives you full flexibility on mobile. Build and edit from a mobile browser or the Base44 app, share your app with users so they can add it to their home screen, and submit it to the App Store or Google Play when you're ready." (See https://docs.base44.com/Building-your-app/Mobile-experience (last visited August 13, 2026)). Base44's documentation describes the resulting mobile application as "a lightweight native wrapper around your web app that opens only your app's URL," which "runs your published Base44 app inside a secure web view"; Base44 will "[g]enerate an App Store ready IPA bundle" and "generate a Google Play ready AAB bundle," and "Base44 automatically configures a Bundle ID and signing key for your app files." (See https://docs.base44.com/documentation/building-your-app/uploading-to-app-stores (last visited August 13, 2026)). Critically, Base44 tells its customers: "[W]hen you publish most content and design changes in Base44, they also appear in your app without sending a new version to the Apple App Store or Google Play." (Id.). Base44's mobile documentation likewise instructs users to "[s]can your app against store guidelines, use AI to fix issues, and generate the IPA and AAB files that you need to upload in your Apple and Google developer accounts," and answers the question whether users must update the app: "No. Any time you make or publish changes, your visitors automatically see the latest version." (See https://docs.base44.com/Building-your-app/Mobile-experience (last visited August 13, 2026)).

29. Defendant's AI-driven generation of working interfaces from described designs is not confined to its Base44 business. Wix has launched Wix Harmony, an AI website builder built around "Aria," Wix's AI agent. Wix's launch announcement states that "Wix Harmony uniquely combines vibe coding with Wix's powerful visual editing capabilities, delivering the speed of AI generation together with pixel-perfect design control," and that "[a]t the heart of Wix Harmony is Aria, an AI agent specialized in building high-quality websites." The announcement further states that users "[u]se chat or prompts to generate native components with built-in logic and code, fully editable alongside manual design tools." (See https://www.wix.com/press-room/home/post/wix-launches-wix-harmony-the-ai-website-builder-that-merges-human-and-artificial-intelligence-rein (last visited August 13, 2026)).

30. Wix also makes, uses, hosts, and offers Wix Vibe, an AI site builder that generates a complete, working website from a user's description while maintaining and displaying the site's structure as a "site blueprint." Wix's documentation states: "You can preview a site blueprint while Wix Vibe builds the pages," and explains that the blueprint "shows your site's structure before you start customizing in the editor." (See https://support.wix.com/en/article/wix-vibe-an-overview (last visited August 13, 2026)). Wix instructs users that they can "view your site blueprint and watch as AI generates the site," and to "[w]atch as the Wix Vibe Editor builds your site in real-time and updates the site blueprint panel on the left." Wix Vibe also accepts literal design artifacts as generation input, including Figma design links and uploaded image files. (See https://support.wix.com/en/article/wix-vibe-creating-your-site (last visited August 13, 2026)). Wix's AI website builder likewise "instantly generates a complete site structure—including relevant pages, layout and on-brand copy," and lets users "[i]nstantly generate pages, sections and visuals as you go." (See https://www.wix.com/ai-website-builder (last visited August 13, 2026)).

31. Wix actively markets, sells, hosts, and distributes the Accused Products and the Related Wix Products throughout the United States, including in the Eastern District of Texas, through the base44.com and wix.com websites, direct sales, and self-service subscriptions, deriving substantial revenue from customers who use Wix's platforms to build, host, and deploy applications and websites. Plaintiff's infringement allegations in the counts below are claim- and instrumentality-specific; the commercial availability of a Related Wix Product does not itself establish that it practices the same claim limitations as a charted Base44 product.

## JURISDICTION AND VENUE

32. This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

33. This Court has personal jurisdiction over Defendant in this action because Defendant has committed acts within this District giving rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice. Defendant, directly and through subsidiaries and intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, making, using, hosting, offering to sell, and selling products and services that infringe the Asserted Patents, and inducing others to infringe the Asserted Patents in this District. Defendant operates interactive, commercial websites and hosted services — including base44.com and the hosted applications served from Defendant's infrastructure — that are accessible to and used by residents of this District, and Defendant contracts with and collects subscription revenue from residents of this District. Defendant regularly conducts and solicits

business in, engages in other persistent courses of conduct in, and derives substantial revenue from goods and services provided to the residents of this District and the State of Texas.

34. Defendant is subject to jurisdiction pursuant to due process and the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.041 et seq., due to its substantial business in this State and District, including at least its infringing activities, its solicitation of business from Texas residents, and its persistent conduct and derivation of substantial revenue from goods and services provided to residents of the State of Texas, including the Eastern District of Texas. In the alternative, Defendant is subject to personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because the claims in this action arise under federal law, Defendant is not subject to the general jurisdiction of the courts of any single state, and exercising jurisdiction over Defendant is consistent with the United States Constitution based on Defendant's purposeful direction of its products and services to the United States as a whole.

35. Wix, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed the Accused Products into the stream of commerce with the intention and expectation that they will be purchased and used by consumers and enterprises in the Eastern District of Texas. Wix also markets and provides the Related Wix Products in this District. The Base44 AI App Builder, Base44 end-to-end platform, and Base44 mobile WebView-wrapper applications have been and continue to be offered, hosted, sold, and used in the Eastern District of Texas.

36. Because this Court has personal jurisdiction over Wix — a foreign company — venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c)(3), and (d). Wix is organized under the laws of Israel and does not reside in any judicial district of the United States; a defendant not resident in the United States may be sued in any judicial district. 28 U.S.C. § 1391(c)(3); see

Brunette Machine Works, Ltd. v. Kockum Industries, Inc., 406 U.S. 706 (1972); In re HTC Corp., 889 F.3d 1349, 1354–57 (Fed. Cir. 2018). Courts in this District have sustained venue over foreign defendants on this basis. See, e.g., Universal Connectivity Techs. Inc. v. Lenovo Grp. Ltd., No. 2:23-cv-00449-JRG (E.D. Tex.); Blitzsafe Texas, LLC v. Bayerische Motoren Werke AG, No. 2:17-cv-00418-JRG (E.D. Tex.). Defendant has also committed acts of direct and indirect infringement in this District by, among other things, making, using, hosting, offering to sell, and selling products and services that infringe the Asserted Patents, has solicited business in this District, transacted business within this District, and attempted to derive financial benefit from residents of this District, including benefits directly related to Defendant's infringement of the Asserted Patents.

37. All allegations and support thereof regarding jurisdiction herein are hereby incorporated by reference for the purposes of venue.

38. With respect to acts of infringement, Wix commits acts of patent infringement within the Eastern District of Texas by making, using, testing, hosting, offering, selling, and providing the Accused Products identified and mapped in this Complaint, including the Base44 AI App Builder and associated generation/project-maintenance functionality and the Base44 mobile app-store packaging capability and resulting WebView-wrapper applications. Residents and businesses in the Eastern District of Texas access and utilize these services, and Wix derives revenue from such use. Plaintiff separately reserves the right to identify additional Wix instrumentalities upon a claim-specific factual showing.

**<u>THE PATENTS-IN-SUIT</u>**

39. On June 25, 2019, United States Patent No. 10,331,423 B1 ("the '423 Patent"), entitled "Utilizing Cross Platform Streamable User Interfaces to Reduce Software Deployment Frequency

Caused by User Interface Improvements," was duly and legally issued by the United States Patent and Trademark Office ("USPTO") from U.S. Application Serial No. 15/678,218, filed August 16, 2017. The '423 Patent identifies itself as a continuation of U.S. Application Serial No. 15/352,834, filed November 16, 2016. That family relationship is pleaded as bibliographic history; Plaintiff does not concede or litigate in this Complaint claim-specific entitlement to any particular effective filing date or priority date. A true and correct copy of the '423 Patent is attached hereto as Exhibit A. The '423 Patent claims patent-eligible subject matter and is presumed valid and enforceable under 35 U.S.C. § 282. Native Pixel Inc. is the exclusive owner by assignment of all rights, title, and interest in the '423 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '423 Patent. Defendant does not have a license to the '423 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '423 Patent whatsoever.

40. On November 14, 2023, United States Patent No. 11,816,459 B2 ("the '459 Patent"), entitled "Graphical User Interface Programming System," was duly and legally issued by the USPTO from U.S. Application Serial No. 15/894,910, filed February 12, 2018. The '459 Patent identifies itself as a continuation-in-part of U.S. Application Serial No. 15/352,834, filed November 16, 2016, and states that it claims the benefit of U.S. Provisional Application No. 62/457,811, filed February 10, 2017. Those family relationships are pleaded as bibliographic history only; Plaintiff does not concede claim-specific entitlement to any particular effective filing date. A true and correct copy of the '459 Patent is attached hereto as Exhibit B. The '459 Patent claims patent-eligible subject matter and is presumed valid and enforceable under 35 U.S.C. § 282. Native Pixel Inc. is the exclusive owner by assignment of all rights, title, and interest in the '459

Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '459 Patent. Defendant does not have a license to the '459 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '459 Patent whatsoever.

41. On October 15, 2024, United States Patent No. 12,118,335 B2 ("the '335 Patent"), entitled "GUI Generation System," was duly and legally issued by the USPTO from U.S. Application Serial No. 18/377,023, filed October 5, 2023. The '335 Patent is a continuation of U.S. Application Serial No. 15/894,910, which issued as the '459 Patent and identifies the family relationships described in Paragraph 40. Those family relationships are pleaded as bibliographic history only and do not concede a family-wide effective filing date for every asserted limitation. A true and correct copy of the '335 Patent is attached hereto as Exhibit C. The '335 Patent claims patent-eligible subject matter and is presumed valid and enforceable under 35 U.S.C. § 282. Native Pixel Inc. is the exclusive owner by assignment of all rights, title, and interest in the '335 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '335 Patent. Defendant does not have a license to the '335 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '335 Patent whatsoever.

42. Plaintiff has complied with the requirements of 35 U.S.C. § 287 for the Asserted Patents.

43. Representative claim charts showing a sample of infringement of one claim of each Patent-in-Suit are appended as Exhibits D–F: Exhibit D maps claim 12 of the '423 Patent to the specifically identified Base44 mobile WebView-wrapper applications and associated packaging/runtime functionality; Exhibit E maps claim 17 of the '459 Patent to the specifically

identified Base44 AI App Builder and its generation/project-maintenance architecture; and Exhibit F maps claim 19 of the '335 Patent to the specifically identified Base44 AI App Builder and its generation/project-maintenance architecture. Each chart is claim- and instrumentality-specific. The charts are illustrative rather than exhaustive as to the charted instrumentality and materially similar versions, but Plaintiff does not contend that a technically distinct Wix or Base44 product satisfies a charted claim merely because it uses AI, reusable components, templates, a hierarchical UI representation, a browser/WebView, or generated source code. Any additional accused instrumentality will be supported by its own claim-specific mapping as required by the Court's Patent Rules. Nor is any chart or asserted claim offered as representative of a different claim for purposes of validity or eligibility under 35 U.S.C. § 101 or otherwise.

## THE ASSERTED PATENTS CLAIM PATENT-ELIGIBLE SUBJECT MATTER

### *A. Claim Construction Precedes Any Assessment of the Character of the Claimed Subject Matter*

44. The construction of multiple claim terms bears directly on the character of the claimed subject matter, including without limitation: (1) "translation layer"; (2) "template," "native code template," and "feature-based template"; (3) "recursively selecting one or more templates for each portion in a tree data structure," including the meaning of "portion"; (4) "source tree structure" in claim 17 of the '459 Patent; (5) "device native computer code," "native source code," related second-device "native" language, and the target-relative role of a "platform"; (6) "front-end development software tool," "UI element associated with a . . . function," and the preamble "User interface (UI) Platform system"; and (7) with respect to the '423 Patent, "environment independent view-controller object," "UI object," "executable lacking sufficient drawing instructions," "object identifier," "instruction identifier," "target native runtime environment," "digital marketplace," and "ignore a user interface programming instruction embedded within the executable." Because

eligibility "requires a full understanding of the basic character of the claimed subject matter," claim construction will ordinarily be desirable, and is often necessary, before that question is reached. Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.), 687 F.3d 1266, 1273–74 (Fed. Cir. 2012). Where the parties dispute construction at the Rule 12 stage, the Court must either adopt the non-moving party's constructions or resolve the dispute to whatever extent is needed to conduct the analysis. MyMail, Ltd. v. ooVoo, LLC, 934 F.3d 1373, 1379–80 (Fed. Cir. 2019); Aatrix Software, Inc. v. Green Shades Software, Inc., 882 F.3d 1121, 1125 (Fed. Cir. 2018).

45. The allegations of this Complaint are pleaded as allegations of fact concerning the claimed inventions, the specifications, the state of the art, the examination records, and Defendant's products. They are not, and shall not be construed as, proposed claim constructions or as positions on the scope or meaning of any claim term. Native Pixel proposes no construction of any term in this pleading and does not concede that any term requires construction in any particular manner. Native Pixel expressly reserves all rights to identify disputed claim terms and to propose constructions in accordance with the Court's standing orders and scheduling orders, and preserves all positions regarding claim construction, 35 U.S.C. § 112, validity, infringement, and claim-specific entitlement to any asserted effective filing date.

***B. The Specific Technical Problems in the Prior Art***

46. The '459 and '335 Patents share a common specification that identifies specific technical problems in the field of cross-platform software development. The specification explains: "However, the problem of creating software programs that are design-driven and maintain multi-platform operability persist, and has led to, over time, large and expensive front-end and back-end software products. For example, the price for a single license of the Microsoft® development platform Visual Studio® in 2013 exceeded $4,200 per seat (or, user), and licensing

its programs separately cost much, much more. Further, these independent products (from whatever company makes them) are the creation of independent, massive development teams, thus leading to compatibility issues within single platforms. Accordingly, there is a need for a single integrated front design and back end development solution that overcomes the disadvantages of existing programming tools, and the present invention is the solution." '459 Patent at 2:12–26.

47. The specification surveys the prior art's failed attempts to solve these problems — including integrated development environments with resource adapters, web services for developing internet applications, online development environment servers with virtual operation spaces and view managers, and device-independent user interface frameworks with code generation tools — and states that each addressed the problem "however unsatisfactorily." '459 Patent at 1:62–2:11. The '459 and '335 Patents expressly frame their subject matter as "providing a technology rooted solution to a technology-based problem via advanced Graphical User Interface (GUI) programming systems." Id. at 1:19–22.

48. A central technical defect of prior approaches was their reliance on middleware or runtime frameworks interposed between design tools and target platforms. Such frameworks imposed measurable machine-level costs on the target device: they "consumed battery power, CPU usage, memory, and performance." '459 Patent at 3:34–39. That is a hardware-level penalty, not a business inconvenience.

49. A second technical defect was that the prior approaches that avoided such frameworks required entirely separate, hand-written codebases for each target platform. The specification illustrates the problem concretely: a developer building an application for Windows would write the UI in C# using C#'s GUI library, while the same application for macOS required a different language (Swift) and different UI tools, so that "[i]f the developer wants to make an update to the

UI, they must do so on two different platforms and then release two new versions of the software." '459 Patent at 10:1–13.

50. The '423 Patent addresses a third, complementary technical problem: the deployment friction that user-interface improvements imposed on applications distributed through digital marketplaces. The '423 Patent's specification explains that under the conventional model, each interface change required rebuilding the deployed application and pushing a new version to end users, who were "forced to download and/or install the application multiple times to receive the improvements during the development cycle" — overhead that "can impede user usage and damage brand positivity, resulting in lost users and lost income." The '423 Patent's claimed solution decouples the user interface from the marketplace-deployed executable: the executable ships with a placeholder and references, the interface is maintained server-side in an environment-independent form, and the running executable receives and renders the current interface at runtime, so that "a developer can make innumerable changes to the UI and dynamically deliver the UI without requiring [the] application to be deployed."

### *C. The State of the Art as of the Relevant 2016–2017 Filing Dates*

51. As of the relevant 2016–2017 filing dates, skilled artisans had access to platform-specific IDEs and interface builders; middleware and runtime frameworks; reusable templates, components, and scaffolds; hierarchical representations of user interfaces; component and layout matching techniques; and webview or hybrid wrappers capable of displaying remotely served content. The Asserted Patents do not claim those building blocks in isolation. With respect to the '423 Patent, the relevant distinction is the particular claimed combination of an environment-independent UI object, a marketplace-deployed executable that lacks sufficient application-

specific drawing instructions and carries the recited identifier references, runtime retrieval and rendering of the UI object, and runtime supersession of an embedded UI instruction.

52. Likewise, the '459 and '335 claims are not alleged to be inventive merely because they use a "template," a tree, reusable components, or software generation. The asserted combinations require, among other relationships, a front-end development tool with a function-bearing UI element; a distinct translation layer associating that function with code native to the identified device; template selection applied per portion of a tree hierarchy; modification of selected templates to create output native source code; a separate feature-based-template selection; and the claimed update of the selected feature-based template with native-source-code and UI/GUI-element information. Claim 17 adds materially different requirements, including computer-generated human-readable created code, second-device native relationships, similarity-based native-code-template selection, and assembly based upon a source-tree structure. Plaintiff alleges that it is these ordered combinations — not the generic ingredients — that distinguish the asserted claims.

53. The accused Base44 platform postdates the 2016–2017 family filings by years, and Base44's mobile app-store packaging capability launched in 2026. Plaintiff does not rely on chronology alone to establish validity or non-conventionality. Rather, Plaintiff relies on the specific claim language, the patents' technical disclosures, the examination records, and evidence concerning the claimed combinations. The later commercial adoption of related design-to-code and no-resubmission capabilities may corroborate technological value, but does not substitute for limitation-by-limitation analysis.

***D. The Claimed Technical Solutions and Their Operative Mechanisms***

54. The claims of the Asserted Patents recite specific technical architectures, not bare results. In the '459 and '335 claims, "translation layer" identifies a software architectural structure with a distinct role: mediating the association between the UI-element/function representation and device-native computer code for the device identified in the translation-layer limitation. The front-end development software tool, translation layer, and template mechanism are separately recited claim elements; Plaintiff does not collapse the recursive template-selection/modification/update sequence into the translation layer or contend that Vite, an SDK, a particular file, an LLM, or the entire end-to-end generation pipeline must alone constitute that layer. The specification supplies architectural context through its UI Platform and User Interface Code Converter disclosures and explains that the platform can generate language-specific UI code without a separate middleware framework, thereby avoiding the performance costs attributed to such frameworks. '459 Patent at 3:28–39.

55. The template terms likewise have concrete, but implementation-neutral, content. Consistent with the intrinsic record and Plaintiff's infringement mappings, a "template" is an identifiable code-bearing or code-generating structure or pattern available for use as a basis for generating output code; it is not limited to a permanently stored disk file or repository entry, but neither does every example, prompt, model output, or arbitrary source-code fragment automatically become a template. A "native code template" is a template containing or defining code for a GUI portion or feature for the programming environment of the platform implemented on the identified device. The specification discloses an embodiment that recursively compares desired-GUI information with relevant templates and selects a closest-representing or "best fit" template before alteration. '459 Patent at 5:5–18; see also id. at 5:56–6:12. That best-fit/ranking

implementation is disclosed as an embodiment, not as an additional limitation of every asserted claim.

56. For the full phrase "recursively selecting one or more templates for each portion in a tree data structure," Plaintiff's allegations track the hierarchical meaning reflected in the claim and specification: selecting one or more templates for each portion of the tree by applying the template-selection operation across portions in the tree's nested hierarchy. A "portion" is the relevant constituent part of that hierarchy to which the selection operation is applied; Plaintiff does not import a fixed node granularity. When the input includes a user-interface tree, the specification describes parsing the tree, selecting templates for its portions, modifying selected templates to create output native source code, and separately processing feature-based templates. '459 Patent at 7:33–45; see also id. Fig. 4. Plaintiff does not contend that the recursive phrase requires a particular traversal direction, root progression, ranking or priority rule, depth-first or breadth-first algorithm, self-calling source-code function, or deterministic/reproducible output.

57. A "feature-based template" is a template associated with a predetermined graphical-user-interface feature and containing or defining code used to implement that feature. The patents describe feature-specific template structures for buttons, text areas, animations, photographs, movies, text-entry fields, and interfaces with backend application code. '459 Patent at 6:13–37. The asserted claims then recite claim-specific update relationships. Claim 19 requires updating the selected feature-based templates with the native source code and the UI element. Claim 17 requires updating the selected feature-based templates with the native source code and one or more GUI design elements native to the second device. Plaintiff's infringement theory tracks those issued claim relationships; it does not substitute the specification's description of updating "overall

templates," and the mere existence, public availability, or insertion of a reusable component is not by itself the claimed updating operation.

58. The patents use "native" relationally with the device identified by the particular limitation. Plaintiff's position is that "device native computer code associated with a first device" and code "native to" an identified device refer to code generated or otherwise written for, and conforming to, the programming environment of the platform implemented on that device; related GUI-element language is treated in the same target-relative way with respect to the GUI environment of the second device. "Platform" refers to the relevant software-and-hardware execution/programming environment implemented on the identified computing device. A browser, WebView, JavaScript engine, VM, interpreter, or similar runtime may be part of that platform and relevant evidence of its programming environment, but Plaintiff does not identify the browser itself as the claimed device and does not contend that mere association with or executability through such a runtime is sufficient. The concrete first/second device and its programming/GUI environment remain infringement facts. The specification attributes processor-time and power benefits to generating source-code files in the receiving device's target code environment. '459 Patent at 5:24–30; see also id. at 4:52–54.

59. Claim 12 of the '423 Patent uses materially different language and Plaintiff does not conflate it with the target-relative native-code limitations of Claims 17 and 19. For pleading and infringement-mapping purposes, Plaintiff maps the later-recited "UI object" in Claim 12 to the same environment-independent view-controller object generated from the UI archetype, as that object is stored, retrieved, received, processed, and rendered at runtime; that mapping does not concede any antecedent-basis defect or indefiniteness. Plaintiff presently uses "target native runtime environment" in Claim 12 to refer to the iOS/Android application runtime in which the

store-distributed wrapper executes and invokes the platform WebView. Plaintiff maps the environment-independent object to the server-maintained runtime UI representation associated with the published-application URL, not to every Base44 source/build artifact. By contrast, Claims 17 and 19 concern generated source/build code and its conformity to the programming environment of a platform implemented on an identified device. Thus, alleging that the Claim 12 runtime UI object is environment-independent does not allege that the source/build artifacts mapped under Claims 17 and 19 are environment-independent, and the artifacts need not be the same.

60. The specifications disclose further specific technical improvements attributable to the claimed architectures, including platform-independent storage with native conversion at runtime; client-side, design-time data integration mapping UI elements to web services; resource-conserving UI object transmission consuming "substantially less" than pixel-based streaming; cross-platform behavioral fidelity achieved using "optimized native code for that platform"; and updating an application's user interface on the end user's device "without needing to rebuild, repackage, and upload the new version to the appropriate distribution platform." '459 Patent at 8:18–26, 9:18–22, 10:14–18, 10:36–46, 11:1–4.

### *E. The Claims Are Directed to Improvements in Computer Functionality, Not to Abstract Ideas*

61. The asserted claims are directed to specific improvements in the way computerized development and delivery toolchains operate — including, for the '459 and '335 claims, the express relationship among a function-bearing UI element, a distinct translation-layer association, template selection applied across portions of a nested hierarchy, modification into native source code, and separate feature-template processing, with Claim 17 adding its similarity and source-tree assembly requirements; and, for Claim 12, a separate marketplace-delivery architecture that supplies a

deployed executable's UI from a stored runtime object. The specificity lies in those express claim relationships and operations. Plaintiff's refusal to add unclaimed ranking, traversal-order, DFS/BFS, self-call, fixed-granularity, or deterministic-output requirements does not convert the claims into result-only limitations. Plaintiff does not characterize the claims at the level of "generate software" or "update an interface remotely." See Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1335–36 (Fed. Cir. 2016); McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1314–16 (Fed. Cir. 2016); Core Wireless Licensing S.A.R.L. v. LG Elecs., 880 F.3d 1356, 1362–63 (Fed. Cir. 2018); Visual Memory LLC v. NVIDIA Corp., 867 F.3d 1253, 1259–61 (Fed. Cir. 2017).

62. The asserted claims are not directed to the mere idea of converting a GUI design or image into code, or of updating software remotely. Such a characterization would omit the express relationships and ordered operations recited by the claims — including the translation layer, per-portion template selection across a tree hierarchy, modification of selected templates into native source code, the separate feature-based-template selection and claimed update, and Claim 17's additional similarity/source-tree requirements; and, in the '423 Patent, the environment-independent UI object, the executable lacking sufficient application-specific drawing instructions and containing the claimed references, marketplace deployment, and runtime rendering that supersedes an embedded UI instruction. Describing the claims "at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." Enfish, 822 F.3d at 1337; see McRO, 837 F.3d at 1313; TecSec, Inc. v. Adobe Inc., 978 F.3d 1278, 1294–95 (Fed. Cir. 2020).

63. Nor are the claims directed to the "mere automation" of a prior manual workflow. A human developer does not perform the claimed machine operation of applying a template-selection

process across portions defined by a machine-readable tree hierarchy, modifying selected code structures into target source code, separately selecting feature-based templates, and performing the recited feature-template update; nor can a human deploy and execute the '423 claim's marketplace binary and cause it at runtime to obtain a stored UI object and supersede an embedded UI instruction. The claimed processes are tied to computer data structures, software components, runtime environments, and executable artifacts.

64. The claims cannot be performed in the human mind or with pen and paper. Claim 17 and Claim 19 require computer processors and software architecture that associate function-bearing UI elements with device-targeted code and perform the separately claimed template operations on machine representations; Claim 12 requires program code that compiles and deploys an executable, stores and retrieves a UI object, and processes and renders that object during runtime. Each asserted claim therefore depends on machine components and machine operations, not mental steps.

***F. The Claim Elements and Their Ordered Combinations Were Not Well-Understood, Routine, or Conventional***

65. Even where individual building blocks were known, the asserted claims allege non-conventional ordered combinations and relationships among those components. The inventive concept may be found in a non-conventional and non-generic arrangement of individually known components. See BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1350, 1352 (Fed. Cir. 2016); Cellspin Soft, Inc. v. Fitbit, Inc., 927 F.3d 1306, 1316–18 (Fed. Cir. 2019).

66. The claim combinations and relationships are central. For Claim 19, Plaintiff relies on a function-bearing UI element; a distinct translation layer associating that function with code for the identified first device; template selection applied across portions of a nested tree hierarchy;

modification of selected templates to create output native source code; separate selection of feature-based templates; and updating those feature-based templates with the native source code and the UI element. Claim 17 includes analogous but materially different relationships, including computer-generated human-readable created code, a second-device GUI/native relationship, updating feature-based templates with native source code and one or more GUI design elements native to the second device, similarity-based selection of a native-code template, and code assembly based upon a source-tree structure. Plaintiff does not equate Claim 17's earlier "tree data structure" with its later "source tree structure": the former is the hierarchical representation across whose portions template selection is applied; the latter is the hierarchical source/design organization used to determine how the resulting code is assembled. The structures may derive from related design information but need not be identical. For Claim 12, Plaintiff relies on the ordered relationship between the environment-independent UI object, the executable that is insufficient by itself to draw the application UI yet contains the claimed references, marketplace deployment, runtime retrieval/rendering, and supersession of an embedded UI instruction. Generic templates, trees, wrappers, component libraries, or AI generation do not satisfy those combinations merely by existing.

67. Whether any claim element or ordered combination was well-understood, routine, and conventional to a skilled artisan as of the applicable effective filing date is a question of fact that must be proven by clear and convincing evidence. Berkheimer v. HP Inc., 881 F.3d 1360, 1368–69 (Fed. Cir. 2018). The factual allegations in this Complaint concerning technological improvement and non-conventionality are tied to the claims, specifications, and prosecution histories, while Plaintiff expressly recognizes that some individual building blocks were known. See Aatrix, 882 F.3d at 1125, 1127–28; Cellspin, 927 F.3d at 1317.

***G. The USPTO Examination Records Support the Materiality of the Ordered Combinations***

68. The prosecution histories support Plaintiff's allegation that the ordered combinations — rather than generic templates or generic UI trees — were material to examination. Prosecution-derived materials identify Yagi (U.S. Pub. No. 2010/0115434), Kitagawa (U.S. Pub. No. 2008/0201576), Grover (U.S. Pub. No. 2015/0193090), and Khader (U.S. Patent No. 8,229,984) as prior-art references addressing pieces of the relevant landscape, while the allowance analysis focused on the ordered recursive/template/native-source/feature-template combination and, for the '459 claims, additional claim-specific operations. Plaintiff does not allege that the mere existence of a template, component library, or tree was itself the basis for allowance.

69. The prosecution materials further reflect that more specific mechanics concerning template ranking, traversal direction, and processing priority were proposed but did not become requirements of the issued claims. The issued recursive language remains tied to selection for portions of a tree data structure without a particular ranking rule, root progression, priority order, depth-first/breadth-first implementation, or self-calling source-code requirement. These allegations concern the prosecution record and are not proposed claim constructions.

70. The '335 prosecution history likewise reflects that Yagi was applied to an earlier form of Claim 19 before the recursive tree, feature-template, and update language was added, followed by amendment and allowance. That history supports the materiality of the full ordered combination; it does not establish that every individual template, component, hierarchy, or code-generation technique was unknown in the art. Plaintiff relies on the issued claim language and the complete intrinsic record, not on an overbroad theory that generic building blocks were novel.

71. The '423 Patent was examined and allowed over the prior art of record. All three Asserted Patents are presumed valid under 35 U.S.C. § 282, and the burden of establishing invalidity rests on the party asserting it. Each claim is presumed valid independently of the validity

of other claims. Native Pixel does not concede that any asserted claim is invalid or indefinite on any ground.

### *H. The Asserted Claims Do Not Preempt Any Field*

72. The asserted claims do not preempt design-to-code conversion, cross-platform user-interface generation, reusable templates, hierarchical UI representations, similarity matching, remote software updating, or any other field. Numerous alternatives remain open, including hand-coded platform-specific interfaces; middleware and runtime-framework approaches; data-driven or interpreted application architectures; webview and hybrid approaches that do not satisfy Claim 12's particular executable/reference/runtime-supersession combination; code generation that does not apply template selection across portions of a nested GUI hierarchy; generation that independently synthesizes code without selecting and modifying a preexisting code-bearing/code-generating template structure; feature/component reuse without the separately claimed feature-template selection and update; and full-binary marketplace redeployment. The claims are confined to their particular combinations and relationships.

### *I. No Claim Is Representative; Each Asserted Claim Requires Separate Analysis*

73. Plaintiff does not designate any claim as representative for purposes of any validity or eligibility analysis, and nothing in this Complaint or its exhibits should be construed as such a designation. Representative treatment is appropriate only where the claims are "substantially similar and linked to the same abstract idea" and the patentee does not identify materially different limitations. See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014); Berkheimer, 881 F.3d at 1365. The asserted claims contain materially different limitations bearing on eligibility, including without limitation: claim 12 of the '423 Patent requires graphical design of a UI archetype within an IDE project, generation of an

environment-independent view-controller object, compilation of an executable lacking sufficient drawing instructions that carries references to object and instruction identifiers, marketplace deployment, and runtime receipt and rendering that ignores embedded interface instructions; claim 17 of the '459 Patent requires generation of "computer-generated human readable created code" and that the software tool "assembles the code based upon the source tree structure"; and claim 19 of the '335 Patent requires a front-end development software tool, translation layer, and template mechanism arranged as a UI Platform system. Each of these limitations bears independently on the § 101 analysis.

**DEFENDANT'S PRODUCTS PRACTICE THE CLAIMED ARCHITECTURES**

74. The Base44 Accused Products do not merely perform the general functions of turning designs into code or updating applications remotely. On information and belief, the specifically identified Base44 instrumentalities implement the claim limitations mapped in Exhibits D–F. For Claim 19 in particular, Plaintiff alleges that the Wix-operated Base44 service uses Wix-controlled non-transitory storage coupled to the processors executing the generation/service instance, and that such storage contains the executable/program code and persistent assets implementing the recited front-end development software tool, translation-layer functionality, and template mechanism; Plaintiff does not rely on client-side editor behavior alone to satisfy the "storage medium . . . containing" relationship. The following allegations rely principally on Base44's own public documentation; where a material internal generator operation is not publicly disclosed, Plaintiff pleads that operation on information and belief and identifies Wix-controlled source code, component/template repositories, system instructions, intermediate representations, generation traces, build/deployment records, project diffs, binaries, or runtime evidence from which it will be established. Discovery will also identify which generation operations are performed by Wix-

controlled Base44 orchestration/code and which, if any, occur within third-party language models invoked by Base44. Plaintiff maps the accused Base44 system as put into service and controlled by Wix and does not assume that merely invoking an external language model independently satisfies a recited limitation. Public materials concerning the Related Wix Products are corroborative only unless and until a separate claim-specific mapping is made.

75. Front-end development software tool with UI elements associated with functions. Plaintiff alleges that Base44 is a developer-facing software environment in which UI elements are created or modified and associated with application functionality. Its Edit mode allows the user to select an individual UI element directly. Base44's own troubleshooting documentation identifies a concrete element/function pair: "This button does not react when clicked, check its onClick handler." Base44 also documents frontend invocation of identified application functions through the preconfigured SDK. (See https://docs.base44.com/Building-your-app/AI-chat-modes; https://docs.base44.com/Community-and-support/Troubleshooting; https://docs.base44.com/developers/backend/resources/backend-functions/overview (last visited August 13, 2026)). Plaintiff uses the representative button/onClick pair consistently in the Claim 17 and Claim 19 infringement theories.

76. Translation layer associating the UI-element function with device-targeted code. On information and belief, Base44's generation-and-integration architecture mediates the association between the representative UI-element/function representation and corresponding generated application code. Base44 publicly documents a structured React/Vite project containing reusable UI elements, application logic, SDK configuration, functions, and build configuration, and it documents frontend code invoking specifically identified functions through base44.functions.invoke(). Plaintiff identifies the accused translation layer as Wix-controlled

generator mappings/integration logic that create, associate, and maintain corresponding component/event-handler code, SDK calls where applicable, and related application logic — not Vite alone, the SDK alone, a single source directory, an external LLM alone, or the separately recited recursive-template mechanism. The device mapping is claim-specific: Exhibit E presently maps Claim 17's first device to the developer/preview computing device and corresponding programming environment and its second device to the target end-user computing device/environment; Exhibit F maps Claim 19's first device to the target receiving computing device and corresponding programming environment. Those mappings may be refined through representative build/deployment evidence and discovery without changing the target-relative meaning of "native."

77. For the "device native computer code" and related native-source limitations, Plaintiff does not rely merely on the labels React, JavaScript, Vite, browser, or WebView. Plaintiff alleges that the relevant code is generated or written for, and conforms to, the programming environment of the platform implemented on the identified first or second device, as the applicable claim requires. Base44's public materials establish generated regular source code, build configuration, preview/deployment environments, and editable output. Representative generated projects, build artifacts, deployment configuration, and Wix's generation/build source code will establish the precise target-environment relationship. (See https://docs.base44.com/developers/app-code/overview/project-structure; https://docs.base44.com/developers/app-code/editor/code-tab (last visited August 13, 2026)).

78. Tree data structure, "portion," and recursive per-portion template selection. Base44 consumes hierarchical representations of requested interfaces. Its Figma-import guidance instructs users to use hierarchy and to "Keep nesting meaningful" so Base44 can understand how UI

elements relate when recreating the design. Base44 also generates structured projects containing pages, reusable components, pre-built UI components, and associated source code. (See https://docs.base44.com/Getting-Started/import-from-figma-guidelines; https://docs.base44.com/developers/app-code/overview/project-structure (last visited August 13, 2026)). Plaintiff alleges that Base44 applies the template-selection operation across constituent portions defined by that nested GUI hierarchy, selecting one or more available code-bearing/code-generating structures for the relevant portions and then performing the separately recited modification and feature-template operations. The infringement theory does not depend on fixed node granularity, traversal direction, ranking or priority, depth-first/breadth-first processing, a self-calling source-code function, or deterministic/reproducible output. The internal tree representation and per-portion selection calls will be established through Wix's generator source code and generation traces.

79. On information and belief, Base44 maintains or derives a machine-readable hierarchical GUI representation and applies its template-selection operation across portions defined by those nesting relationships, selecting one or more identifiable code-bearing or code-generating structures for relevant portions and modifying selected structures to create corresponding output source code. Base44's element-specific AI/Visual Edit functionality and the Code tab's mapping between previewed pages and the code files that power them corroborate localized generation and modification, while the selected-template before/after states and intermediate generator operations remain within Wix's control.

80. Plaintiff's recursive infringement theory does not require deterministic or reproducible output, a particular traversal direction, ranking or priority rule, depth-first or breadth-first processing, or a source-code function that calls itself. Nor does Plaintiff contend that a React

component tree, a file-directory tree, or the existence of reusable components, standing alone, satisfies the claimed recursive template operation. Wix's internal GUI representation, per-portion selection calls, selected-template states, and generation traces will supply the implementation proof.

81. Feature-based templates for predetermined features and the claimed updating operation. Base44 publicly identifies reusable UI elements, a ui/ subfolder of pre-built UI components, and use of a component library. Plaintiff alleges that the generator has available identifiable templates associated with predetermined GUI features and containing or defining code used to implement those features. Those public facts support candidate feature-based templates, but Plaintiff does not contend that every reusable component automatically satisfies the term. Plaintiff further alleges that, after selection, Base44 performs the claim-specific update operation using generated native source code and the applicable UI/GUI element information — the UI element in Claim 19 and one or more GUI design elements native to the second device in Claim 17. Public documentation shows generated editable source, pre-built components, and element-specific design modification, but does not expose the precise direction or before-and-after internal object state of that update. Plaintiff will establish the selected feature-template instance, its state before and after updating, the source-code and UI/GUI-element information supplied to it, and the sequence of generator operations through Wix's source code, intermediate representations, generation traces, and representative project diffs.

82. On information and belief, after Base44 selects a feature-specific structure for a predetermined GUI feature, the generator updates that selected feature-based template with the recited generated native-source-code information and the properties/data of the particular UI or GUI design element, including its content, visual properties, layout/styling information, and

function association. Plaintiff's theory is the claimed update direction and object state; it is not merely that Base44 inserts a generic component into an application.

83. Base44's public documentation concerning pre-built login UI, provider-specific sign-in buttons, element-specific AI editing, and generated editable code corroborates feature-specific selection and modification. It does not, standing alone, expose the internal direction and state of the claimed feature-template update. Plaintiff will identify the selected feature-template instance, its state before and after updating, the source-code information supplied to it, and the associated UI/GUI-element information through Wix's generator source code, intermediate representations, and generation traces. (See https://docs.base44.com/Setting-up-your-app/Managing-login-and-registration; https://docs.base44.com/Building-your-app/AI-chat-modes; https://docs.base44.com/developers/app-code/editor/code-tab (last visited August 13, 2026)).

84. Plaintiff does not contend that the authorship, public availability, physical storage location, or file format of a template is itself dispositive. Nor does Plaintiff rely on Base44's user-selected whole-application Template Marketplace, standing alone, as satisfying the internal per-portion recursive template-selection, similarity-selection, or feature-template-update requirements.

85. Human-readable generated code and target-environment proof. Base44 publicly exposes generated application source code for human inspection and editing in the Code tab and permits project synchronization/export. Those facts directly support the computer-generated human-readable-code aspect of Claim 17. For the separate native-code requirements, Plaintiff alleges that the relevant generated/built source and code artifacts are generated or written for, and conform to, the programming environment of the platform implemented on the identified device. Plaintiff does not contend that labels such as React, JavaScript, Vite, browser, or WebView,

standing alone, conclusively establish the native-code limitations. Representative generated projects, build output, deployment configuration, and Wix's generation/build source code will establish the concrete device, platform/programming environment, and target conformity on which Plaintiff relies. (See https://docs.base44.com/developers/app-code/editor/code-tab; https://docs.base44.com/developers/app-code/overview/project-structure; https://base44.com/blog/base44-github-integration (last visited August 13, 2026)).

86. Desired-GUI input, native-code-template similarity, and source-tree assembly. Base44 accepts natural-language descriptions and Figma designs as input regarding a desired GUI. Its Figma guidance emphasizes frames, groups, Auto Layout hierarchy, and meaningful nesting, and Base44 states that it recreates the design's layout, structure, and visual style. For Claim 17, Plaintiff alleges that Base44 compares features represented in the desired-GUI information with available native-code templates — i.e., templates containing or defining code for a GUI portion or feature for the programming environment of the platform implemented on the second device — and selects a template describing GUI features similar to those represented in the input. Plaintiff separately alleges that Base44 maintains or derives a hierarchical source/design organization that governs how selected/generated code portions are assembled into the resulting application. Plaintiff does not equate that "source tree structure" with the earlier "tree data structure," nor with the final React component tree or file-directory tree standing alone. The source/design organization may derive from or relate to the hierarchy used for per-portion selection, but the mapping does not require the structures to be identical. The internal similarity representation/criteria, source-tree representation, and assembly operation will be established through Wix's generator source code, system instructions, intermediate representations, and generation traces. (See https://docs.base44.com/Getting-Started/import-from-figma-guidelines;

https://docs.base44.com/developers/app-code/editor/code-tab; https://docs.base44.com/developers/app-code/overview/project-structure (last visited August 13, 2026)).

87. The '423 delivery architecture: marketplace-deployed executables lacking sufficient application-specific drawing instructions. Base44's mobile app-store packaging generates store-ready iOS and Android binaries and describes each as "a lightweight native wrapper around your web app that opens only your app's URL" and as running the published Base44 app "inside a secure web view." Plaintiff presently identifies the Claim 12 target native runtime environment as the iOS/Android application runtime in which that wrapper executes and invokes the platform WebView. These admissions strongly support Plaintiff's theory that the wrapper binary, standing alone, lacks sufficient application-specific instructions to reproduce the then-current hosted Base44 interface. Plaintiff presently identifies the configured application URL as the claimed object-identifier reference and alleges that the wrapper also contains or invokes the claimed instruction-identifier reference used to retrieve/process the UI object. The latter sub-limitation will be confirmed from representative IPA/AAB binaries, wrapper configuration/source, and runtime request traces. (See https://docs.base44.com/documentation/building-your-app/uploading-to-app-stores; https://docs.base44.com/Building-your-app/Mobile-experience (last visited August 13, 2026)).

88. The '423 delivery architecture: environment-independent UI object, runtime retrieval/rendering, and supersession of embedded UI instructions. For the Claim 12 infringement mapping, Plaintiff identifies the published application's server-maintained runtime UI representation associated with the stable application URL as the environment-independent view-controller object and the later-recited UI object. Base44 states that later published content and

design changes appear in installed applications without sending a new version to the Apple App Store or Google Play. Plaintiff alleges that the unchanged wrapper receives and processes the then-current stored UI object at runtime and renders a different interface from that object. That runtime-delivered UI object is not alleged to be the same artifact as the generated source/build code mapped under Claims 17 and 19. For the separate requirement that the executable ignore a user-interface programming instruction embedded within the executable, Plaintiff alleges that the wrapper contains app-shell or initial-presentation UI instructions that are bypassed or superseded when the live hosted UI object is successfully received and rendered. Plaintiff does not treat no-resubmission, by itself, as conclusive proof of that sub-limitation; the embedded instruction and runtime control path will be established through representative binaries, wrapper source/configuration, network traces, and controlled before/after-publish testing.

89. Related Wix products and the commercial scale of the accused field. Wix offers additional AI web-creation products, including Wix Harmony, Wix Vibe, and the Wix AI website builder, and markets them across a user base Wix reports exceeds 300 million. Wix's public materials describe those products as generating working websites and components from user descriptions and imported design files, and as presenting the resulting structure and generated code to the user. Plaintiff cites those materials to establish the commercial significance and scale of the accused field, the breadth of Defendant's operations in it, and the existence of additional Wix instrumentalities that may be separately mapped as discovery proceeds. Plaintiff does not cite those materials as evidence of what was known or practiced in the art, and does not allege that any Related Wix Product practices any asserted claim absent a claim-specific, limitation-by-limitation mapping.

90. Plaintiff does not rely on Wix Vibe's blueprint, a Wix repeater template, Harmony's use of the word "native," or any other isolated feature of a Related Wix Product as a substitute for the limitation-by-limitation proof required for Claims 17 or 19. Any allegation that a Related Wix Product separately infringes an asserted claim will identify the concrete UI-element/function mapping, translation-layer architecture, target-device/native-code relationship, identifiable template structures, per-portion nested-hierarchy selection and selected-template modification, feature-based-template selection/update, and any Claim 17 second-device, similarity, or source-tree requirements applicable to that instrumentality.

## ACCUSED INSTRUMENTALITIES

91. Defendant makes, uses, sells, offers to sell, tests, designs, hosts, operates, and distributes the Accused Products, including without limitation the Base44 AI App Builder; the Base44 end-to-end application platform and generation/project-maintenance services; the Base44 editor surfaces, including AI chat, Visual Edit, Figma import, screenshot/media import, and Code tab; Base44 developer tooling, including GitHub synchronization, CLI/project export, backend functions and SDK integration; and the Base44 mobile app-store packaging capability and resulting WebView-wrapper applications distributed through the Apple App Store and Google Play. These accused instrumentalities are mapped to particular asserted claims in Exhibits D–F. Wix also operates the Related Wix Products identified above. Plaintiff reserves the right to add or further specify additional instrumentalities as discovery proceeds, but does not allege that every Wix product infringes every asserted patent or that technically distinct products infringe in the same general way.

92. Defendant has knowingly (since at least the date of the initial Complaint) and willfully infringed the Patents-in-Suit, and has intentionally and actively aided, abetted, and induced others

to directly infringe each of the Patents-in-Suit (such as its customers in this District and throughout the United States).

## COUNT I

## PATENT INFRINGEMENT OF THE '423 PATENT

93. Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

94. Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '423 Patent, including at least claim 12, by making, using, testing, hosting, selling, and/or offering for sale in the United States Defendant's Accused Products, including without limitation the Base44 platform software and the Base44 mobile WebView-wrapper applications and packaging capability.

95. Defendant also indirectly infringes the '423 Patent by actively inducing the direct infringement of third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint. Defendant knowingly, intentionally, and actively aids, abets, and induces others to directly infringe at least one claim of the '423 Patent — including its customers, who generate the wrapper executables and submit them to the Apple App Store and Google Play in the manner Defendant prescribes — with knowledge of the '423 Patent and with the specific intent that its customers infringe.

96. Defendant provides information and technical support to its customers, including promotional materials, product manuals, documentation, demonstrations, and website materials — including without limitation the app-store packaging documentation at https://docs.base44.com/documentation/building-your-app/uploading-to-app-stores and the

mobile-experience documentation at https://docs.base44.com/Building-your-app/Mobile-experience (each last visited August 13, 2026) — encouraging its customers to purchase and instructing them to use Defendant's Accused Products in the infringing manner (which uses are acts of direct infringement of the '423 Patent).

97. Defendant contributorily infringes the '423 Patent under 35 U.S.C. § 271(c) because, with knowledge of the '423 Patent (since at least the date of this Complaint), Defendant supplies a material part of the claimed combination — including the generated wrapper executables and the hosted UI delivery infrastructure — which is not a staple article of commerce and is incapable of substantial non-infringing use, and which is especially made and adapted for use in an infringement of the '423 Patent.

98. Defendant's customers, such as businesses and end users, directly infringe claims of the '423 Patent by using the Accused Products in the manner prescribed by Defendant.

99. Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, hosting, and use of the Accused Products constitutes direct infringement of the '423 Patent but has taken deliberate actions to avoid learning of these facts.

100. On information and belief, Defendant's Accused Products are available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

101. Defendant has caused Native Pixel irreparable injury and damage by infringing one or more claims of the '423 Patent.

102. Defendant's infringement of the '423 Patent after the date of this Complaint is willful and merits increased damages.

103. The representative claim chart attached hereto as Exhibit D describes how exemplary claim 12 of the '423 Patent is infringed by the specifically identified Base44 mobile WebView-

wrapper applications and associated packaging/runtime functionality. The chart is illustrative rather than exhaustive as to that instrumentality and materially similar versions, but Plaintiff does not contend that technically distinct Wix or Base44 products practice Claim 12 through the same mechanism without a separate claim-specific mapping. Exhibit D is not an allegation or admission that claim 12 is representative of any other claim for validity or eligibility analysis. Plaintiff reserves its right to provide greater detail through its Infringement Contentions and discovery.

## COUNT II

## PATENT INFRINGEMENT OF THE '459 PATENT

104. Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

105. Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '459 Patent, including at least claim 17, by making, using, testing, hosting, selling, and/or offering for sale in the United States the Base44 AI App Builder and the associated Base44 generation, project-maintenance, editing, build, and hosting functionality mapped in Exhibit E. Plaintiff reserves the right to identify additional Wix instrumentalities under Claim 17 if discovery supports a separate limitation-by-limitation mapping; no such additional product is accused merely because it uses AI, generates a website, or employs reusable components.

106. Defendant uses the claimed system within the meaning of 35 U.S.C. § 271(a) by putting the specifically accused Base44 system as a whole into service. Defendant operates and controls the generation/orchestration engine, reusable code/template infrastructure, managed development environment, code storage, project-maintenance services, and publishing/hosting infrastructure and obtains benefit from that operation in the form of subscription and usage

revenue. Plaintiff alleges that the recited Claim 17 operations are performed by the Base44 system under Wix's control; discovery will identify which sub-operations are implemented directly in Wix-controlled orchestration/code and which, if any, occur inside third-party language models invoked by that Wix-controlled system. See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc., 631 F.3d 1279, 1284 (Fed. Cir. 2011).

107. Defendant also indirectly infringes the '459 Patent by actively inducing the direct infringement of third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint. Defendant knowingly, intentionally, and actively aids, abets, and induces others to directly infringe at least one claim of the '459 Patent (such as its customers in this District and throughout the United States), with knowledge of the '459 Patent and with the specific intent that its customers infringe.

108. Defendant provides information and technical support to its customers, including promotional materials, product manuals, documentation, demonstrations, and website materials — including without limitation Base44's quick-start documentation, Code tab documentation, Figma-import guidance, Visual Edit documentation, project-structure documentation, and backend-function/SDK documentation — encouraging customers to purchase and instructing them to use Defendant's Base44 Accused Products in the infringing manner. (See, e.g., https://docs.base44.com/Getting-Started/Quick-start-guide; https://docs.base44.com/developers/app-code/editor/code-tab; https://docs.base44.com/Getting-Started/import-from-figma-guidelines; https://docs.base44.com/Building-your-app/AI-chat-modes; https://docs.base44.com/developers/app-code/overview/project-structure; https://docs.base44.com/developers/backend/resources/backend-functions/overview (last visited August 13, 2026)).

109. Defendant contributorily infringes the '459 Patent under 35 U.S.C. § 271(c) because, with knowledge of the '459 Patent since at least the date of this Complaint, Defendant supplies and operates material portions of the specifically accused Base44 claim combination, including the hosted generation-and-integration architecture, code-generation assets, project-maintenance functionality, and related infrastructure configured for the Claim 17 operations alleged above, which Plaintiff alleges are especially made or adapted for infringing use and are not staple articles or commodities of commerce suitable for substantial non-infringing use in the accused configuration.

110. Defendant's customers, such as businesses and end users, directly infringe claims of the '459 Patent by using the Accused Products in the manner prescribed by Defendant.

111. Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, hosting, and use of the Accused Products constitutes direct infringement of the '459 Patent but has taken deliberate actions to avoid learning of these facts.

112. On information and belief, Defendant's Accused Products are available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

113. Defendant has caused Native Pixel irreparable injury and damage by infringing one or more claims of the '459 Patent.

114. Defendant's infringement of the '459 Patent after the date of this Complaint is willful and merits increased damages.

115. The representative claim chart attached hereto as Exhibit E describes how exemplary claim 17 of the '459 Patent is infringed by the specifically identified Base44 AI App Builder and associated generation/project-maintenance functionality. The chart is illustrative rather than exhaustive as to that instrumentality and materially similar versions, but it does not assume that

technically distinct Wix products infringe Claim 17 in the same general way. Any additional instrumentality will be separately mapped. Exhibit E is not an allegation or admission that claim 17 is representative of any other claim for validity or eligibility analysis. Plaintiff reserves its right to provide greater detail through its Infringement Contentions and discovery.

**COUNT III**

**PATENT INFRINGEMENT OF THE '335 PATENT**

116. Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

117. Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '335 Patent, including at least claim 19, by making, using, testing, hosting, selling, and/or offering for sale in the United States the Base44 AI App Builder and the associated Base44 generation, project-maintenance, editing, build, SDK-integration, and hosting functionality mapped in Exhibit F. Plaintiff reserves the right to identify additional Wix instrumentalities under Claim 19 if discovery supports a separate limitation-by-limitation mapping; no such additional product is accused merely because it uses AI, generates a website, or employs reusable components.

118. Defendant uses the claimed system within the meaning of 35 U.S.C. § 271(a) by putting the specifically accused Base44 system as a whole into service. Defendant operates and controls the generation/orchestration engine, reusable code/template infrastructure, managed development environment, project-maintenance services, code storage, and publishing/hosting infrastructure and obtains benefit from that operation in the form of subscription and usage revenue. On information and belief, Wix-controlled non-transitory storage coupled to the processors executing the accused service contains the executable/program code and persistent

assets implementing the Claim 19 front-end development software tool, translation-layer functionality, and template mechanism. Plaintiff alleges that the recited Claim 19 operations are performed by the Base44 system under Wix's control; discovery will identify which sub-operations are implemented directly in Wix-controlled orchestration/code and which, if any, occur inside third-party language models invoked by that Wix-controlled system. See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc., 631 F.3d 1279, 1284 (Fed. Cir. 2011).

119. Defendant also indirectly infringes the '335 Patent by actively inducing the direct infringement of third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint. Defendant knowingly, intentionally, and actively aids, abets, and induces others to directly infringe at least one claim of the '335 Patent (such as its customers in this District and throughout the United States), with knowledge of the '335 Patent and with the specific intent that its customers infringe.

120. Defendant provides information and technical support to its customers, including promotional materials, product manuals, documentation, demonstrations, and website materials — including without limitation Base44's Figma-import guidance, Visual Edit documentation, Code tab and project-structure documentation, troubleshooting documentation identifying a button/onClick element-function pair, and backend-function/SDK documentation — encouraging customers to purchase and instructing them to use Defendant's Base44 Accused Products in the infringing manner. (See, e.g., https://docs.base44.com/Getting-Started/import-from-figma-guidelines; https://docs.base44.com/Building-your-app/AI-chat-modes; https://docs.base44.com/developers/app-code/editor/code-tab; https://docs.base44.com/developers/app-code/overview/project-structure; https://docs.base44.com/Community-and-support/Troubleshooting;

https://docs.base44.com/developers/backend/resources/backend-functions/overview (last visited August 13, 2026)).

121. Defendant contributorily infringes the '335 Patent under 35 U.S.C. § 271(c) because, with knowledge of the '335 Patent since at least the date of this Complaint, Defendant supplies and operates material portions of the specifically accused Base44 UI Platform combination, including the front-end development, generation-and-integration, template-processing, and project-maintenance infrastructure configured for the Claim 19 operations alleged above, which Plaintiff alleges are especially made or adapted for infringing use and are not staple articles or commodities of commerce suitable for substantial non-infringing use in the accused configuration.

122. Defendant's customers, such as businesses and end users, directly infringe claims of the '335 Patent by using the Accused Products in the manner prescribed by Defendant.

123. Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, hosting, and use of the Accused Products constitutes direct infringement of the '335 Patent but has taken deliberate actions to avoid learning of these facts.

124. On information and belief, Defendant's Accused Products are available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

125. Defendant has caused Native Pixel irreparable injury and damage by infringing one or more claims of the '335 Patent.

126. Defendant's infringement of the '335 Patent after the date of this Complaint is willful and merits increased damages.

127. The representative claim chart attached hereto as Exhibit F describes how exemplary claim 19 of the '335 Patent is infringed by the specifically identified Base44 AI App Builder and associated generation/project-maintenance functionality. The chart is illustrative rather than

exhaustive as to that instrumentality and materially similar versions, but it does not assume that technically distinct Wix products infringe Claim 19 in the same general way. Any additional instrumentality will be separately mapped. Exhibit F is not an allegation or admission that claim 19 is representative of any other claim for validity or eligibility analysis. Plaintiff reserves its right to provide greater detail through its Infringement Contentions and discovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Native Pixel Inc. respectfully requests the following relief:

A. A judgment that Defendant has directly infringed literally and/or under the doctrine of equivalents and continues to directly infringe the Patents-in-Suit set forth in this Complaint;

B. A judgment that Defendant has, since at least the date of this Complaint, actively induced infringement and continues to induce infringement of the Patents-in-Suit set forth in this Complaint;

C. A judgment that Defendant has, since at least the date of this Complaint, contributorily infringed and continues to contributorily infringe the Patents-in-Suit set forth in this Complaint;

D. A judgment and order requiring Defendant to pay Plaintiff damages under 35 U.S.C. § 284, including without limitation both convoyed and derivative sales, as well as supplemental damages for any continuing post-verdict infringement through entry of the final judgment with an accounting as needed;

E. A judgment that Defendant's infringement since at least the date of this Complaint of each of the Patents-in-Suit is willful;

F. A judgment that Defendant's infringement warrants enhanced damages pursuant to 35 U.S.C. § 284 and application of such damages;

G. A judgment that this is an exceptional case within the meaning of 35 U.S.C. § 285 and Plaintiff is therefore entitled to reasonable attorneys' fees;

H. A judgment granting a preliminary and permanent injunction preventing Wix and its officers, directors, agents, servants, employees, attorneys, licensees, divisions, parents, subsidiaries, successors, assigns, and all those in privity, concert, or participation with any of them, from directly or indirectly engaging in infringing activities with respect to the Patents-in-Suit;

I. An accounting for acts of infringement and supplemental damages for infringement and/or damages not presented at trial, including, without limitation, pre-judgment and post-judgment interest on the damages awarded;

J. A judgment and order awarding an ongoing royalty;

K. A judgment and order awarding Plaintiff costs associated with bringing this action;

L. All equitable relief the Court deems just and proper; and

M. Such other relief which may be requested and to which the Plaintiff is entitled.

## DEMAND FOR JURY TRIAL

128. Pursuant to FED. R. CIV. P. 38, Plaintiff Native Pixel Inc. hereby demands a trial by jury on all issues so triable.

Date: August 14, 2026

Respectfully submitted,

*/s/ Erick S. Robinson*

Erick S. Robinson (Lead Counsel)
Texas Bar No. 24039142
Gregory Love
Texas Bar No. 24013060
CHERRY JOHNSON SIEGMUND JAMES PC
104 E Houston Street, Suite 115
Marshall, Texas 75670
Tel: (713) 498-6047
Fax: (713) 583-9737

erobinson@cjsjlaw.com
glove@cjsjlaw.com

Mark D. Siegmund
Texas Bar No. 24117055
"Grace" Shuya Yang
Texas Bar No. 24144144
CHERRY JOHNSON SIEGMUND JAMES PC
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com
gyang@cjsjlaw.com

Ari Rafilson
Texas Bar No. 24060456
Ryan Loveless
Texas Bar No. 24036997
CHERRY JOHNSON SIEGMUND JAMES PC
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Tel: (972) 987-0709
Fax: (866) 627-3509
arafilson@cjsjlaw.com
rloveless@cjsjlaw.com

*Attorneys for Plaintiff*

***NATIVE PIXEL INC.***